**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-19-00294-001-PHX-MTL |
| Plaintiff, | **ORDER** |
| v. | |
| Kenneth K. Losch, | |
| Defendant. | |

Defendant Kenneth K. Losch has filed a Motion to Suppress pursuant *Franks v. Delaware*, 438 U.S. 154 (1978), requesting an evidentiary hearing and the suppression of evidence. (Doc. 108.) The Motion is fully briefed. (Doc. 108); (Doc. 119); (Doc. 124.) For reasons that follow, the Motion is denied.

## I.    BACKGROUND

Defendant was indicted on seventeen counts of Wire Fraud. (Doc. 4.) The indictment alleges that between January 2013 and January 2014 Defendant devised a scheme to defraud investors of millions of dollars by soliciting funds under false pretenses and misrepresentations related to the commercialization of a conversion kit that would convert diesel semi-truck engines to run on natural gas. (*Id*.) Defendant moves to suppress all evidence seized pursuant to six search warrants that were executed in December 2015. The search warrants were issued by two different magistrate judges based on virtually identical affidavits ("the Affidavit"), which were submitted by Special

1   Agent Capello of the Federal Bureau of Investigation ("FBI").[1]   (Doc. 108 at 5.)
2   Defendant contends that Special Agent Capello "did not tell the whole story" by omitting
3   material facts and making material misrepresentations in the Affidavit to create the false
4   impression that Defendant operated an illegitimate company as a means to enrich
5   himself.   (*Id*. at 3.) Defendant seeks an evidentiary hearing ("*Franks* hearing") to
6   determine whether suppression is required.  (*Id*. at 6-8.)

7   **II.   LEGAL STANDARDS**

8       The Fourth Amendment provides that "no Warrants shall issue, but upon probable
9   cause, supported by Oath or affirmation, and particularly describing the place to be
10  searched or the persons or things to be seized."  U.S. CONST. amend. IV.  A magistrate
11  judge may authorize a search of a location, therefore, only if the affiant establishes
12  probable cause to believe that evidence of a crime may be found there.  *United States v.*
13  *Hill*, 459 F.3d 966, 970 (9th Cir. 2006). "Probable cause means only a 'fair probability,'
14  not certainty, and requires consideration of the totality of the circumstances" set forth in
15  the affidavit.  *Id*. (*citing Illinois v. Gates*, 462 U.S. 213, 238 (1983)). There is a
16  "presumption of validity with respect to the affidavit supporting the search warrant."
17  *Franks*, 438 U.S. at 171.

18      In *Franks v. Delaware*, the Supreme Court held that a defendant may challenge a
19  facially valid search warrant affidavit by making a substantial preliminary showing that it
20  contains intentionally or recklessly false statements, and that the affidavit purged of its
21  falsities would not be sufficient to support a finding of probable cause. *Id*. at 155.  Where
22  the defendant makes such a threshold preliminary showing, the Fourth Amendment
23  requires that an evidentiary hearing be held at the defendant's request.  *Id*. at 155-56.

24      While the factual showing of probable cause in a search warrant affidavit must be
25  truthful, the Fourth Amendment does not require that "every fact recited in the warrant
26  affidavit is necessarily correct, for probable cause may be founded upon hearsay and

27
28  [1] The six search warrants were issued by two magistrate judges.  (Doc. 111 at 5.)  The
    Government does not dispute that the affidavits presented to both magistrate judges were
    "virtually identical in substance." (*See* Doc. 111 at 4.)  The Court therefore does not
    analyze the affidavits separately and refers to them herein as "the Affidavit."

upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily." *Id.* at 165. To mandate a *Franks* hearing, the defendant must allege a deliberate falsehood or reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. *Franks*, 438 U.S. at 171. "Affidavits or sworn or otherwise reliable statements should be furnished, or their absence satisfactorily explained." *Id.* Allegations of negligence or innocent mistakes are insufficient. *Id.*

Although *Franks v. Delaware* dealt with a situation in which the defendant claimed the search warrant affidavit contained a false statement, the Ninth Circuit in *United States v. Stanert*, 762 F.2d 775, 781-82 (9th Cir. 1985), held that the reasoning of *Franks* logically extends to material omissions, too. Therefore, where the defendant makes a substantial preliminary showing that the affiant intentionally or recklessly "omitted facts required to prevent technically true statements in the affidavit from being misleading" and that the affidavit supplemented by the omissions would not be sufficient to support a finding of probable cause, a *Franks* hearing is required. *Stanert*, 762 F.2d at 781-82. The effect of a misrepresentation or omission on the existence of probable cause is considered cumulatively. *Id.* at 782.

Whether a *Franks* hearing is required and whether the defendant will prevail at that hearing are, of course, two separate issues. Even if the defendant has made the threshold showing to warrant a *Franks* hearing, he still bears the burden of proving at the hearing by a preponderance of the evidence that were false statements or omissions, and that the affidavit purged of those falsities and supplemented by the omissions would not be sufficient to support a finding of probable cause. *Franks,* 438 U.S. at 171-72; *Stanert*, 762 F.2d at 782. If the defendant meets his burden at the evidentiary hearing, the search warrant must be voided and the fruits of the search excluded. *Franks*, 438 U.S. at 156.

## III.   DISCUSSION

Defendant alleges that Special Agent Capello knowingly and intentionally, or with reckless disregard for the truth, omitted six categories material facts from the Affidavit

and made other material misrepresentations.  (Doc. 108 at 3-4, 23.)  He also asks the Court to disregard allegations in the Affidavit that he claims are conclusory or not attributed to Defendant.  (Doc. 124 at 3-4.)  The Court addresses each argument in turn.

### A.    Overview of the Affidavit

Preliminarily, the Affidavit is facially sufficient to establish probable cause, and Defendant does not contend otherwise. According to the Affidavit, in 2008 Defendant formed a business partnership with two individuals, R.M. and R.O., that was focused on developing cutting-edge "green energy" technologies in the fuel and transportation sectors.  (Doc. 108-3, ¶ 11.)  R.M. invented and owned the underlying technology, and in 2009, the three entered into an operating agreement and formed various business entities to launch their business venture: Advanced Green Technologies, LLC ("AGT"), Advanced Green Innovation, LLC ("AGI"), and subsidiary companies formed under AGI, including ZHRO Solutions, ZHRO Power, and H2 Energy.  (*Id*. ¶¶ 11.b, 12.a-c.) ZHRO Solutions claimed to have an exclusive technology that could convert diesel truck engines from operating on regular fuel to running on compressed natural gas, (*id*. ¶ 17.a); ZHRO Power claimed to have an exclusive technology that could convert stationary diesel engines (like back-up generators) to operate on compressed natural gas (*id*. ¶ 17.b); and H2 Energy was focused on producing biogases from renewable feedstock less expensively than either the petroleum production of gasoline or coal-based generation of electricity, (*id*. ¶ 17.c).

AGT was formed as the parent company that held the intellectual property and technology patents, which AGT obtained through a licensing agreement with R.M.'s company, R.M. Technologies, LLC.  (*Id*. ¶ 12.a.)  AGI was the operating company of AGT.  (*Id*. ¶ 12.b.)  Defendant owned 51% of AGI through an entity called Cochise Investments, which was wholly controlled by Defendant.  (*Id*. ¶ 13.c.)  In exchange for a controlling ownership equity stake in AGI, Defendant promised R.O. and R.M. that he would contribute $10 million in initial capital to the company.  (*Id*. ¶ 13.c.) A review of AGI's financial records, however, revealed that Defendant may have contributed only

1   $650,000 in seed money to AGI.  (*Id.* ¶ 13.c.ii.)

2         As the Chief Executive Officer of AGI, Defendant had virtually exclusive

3   discretion in the management and control of AGI and its subsidiaries.  (*Id.* ¶ 14.)

4   Defendant scripted the AGI business development team on what to say to investors, and

5   he forbid the development team from speaking with members of AGI's engineering team.

6   (*Id.* ¶ 61.) All financial matters pertaining to AGI and its subsidiaries were directed by

7   Defendant.  (*Id.* ¶ 14.)  In April 2015, Defendant fired founding members R.M. and R.O.,

8   as well as the head engineer, W.S., after they pushed Defendant for access to AGI's

9   financial records.  (*Id.* ¶ 35.)

10        AGI's sole source of revenue since its inception was the inflow of investor funds.

11  (*Id.* ¶ 21.)  The Affidavit states that in total, AGI raised between $137 and $160 million

12  from over 4,000 investors.  (*Id.* ¶¶ 4, 21.b.) Through distribution agreements with third

13  party investors, which provided each distributor the exclusive right to promote and sell

14  the "conversion kits" within a specified territory, AGI raised approximately $107 million.

15  (*Id.* ¶ 21.)  The rest was raised through equity share offerings in the company.  (*Id.*

16  ¶ 21.a- b.)

17        The success of AGI was dependent on commercializing and/or licensing ZHRO

18  and H2 Energy technology to third parties, but as of December 2015, AGI failed to

19  produce a working prototype, commercialize products or generate any revenue.  (*Id.*

20  ¶ 18.a.)  According to the Affidavit, Defendant defrauded investors out of more than

21  $130 million by making materially false statements and omissions to induce investments,

22  and then using a portion of those investments for personal expenses or businesses not

23  related to AGI, which caused AGI's business accounts to be exhausted of funds and

24  hindered technological development. (*Id.* ¶¶ 4, 30, 46.)

25        **1.    Defendant's alleged misrepresentations or omissions to induce
                  investments**

26

27        The Affidavit alleged that Defendant "oversold" the technology to investors by

28  making promises that were not possible to keep.  (*Id.* ¶ 5.e.i.)  For example, Defendant

    told investors in 2008 that the conversion kits would be ready for commercialization

within 12 to 24 months. (*Id.* ¶ 38.d.)  Distribution agreement holders were originally told that conversion kits would be available in 2013, but the date was repeatedly pushed back. (*Id.* ¶ 22.)  As of October 2015, investors were told that the conversion kits would not be available until 2017.  (*Id.*)  Demonstrations for potential investors were also staged. While the technology displayed during demonstrations was authentic, Defendant told investors that the injectors they were viewing had been running for over 100 hours and were hitting all their "marks," when in reality the injectors could only run for 10 minutes without failing.  (*Id.* ¶¶ 5.e.ii, 20.a-c.)  The Affidavit also alleged that Defendant personally confirmed to investors that no investment funds would be used for expenses not directly related to the AGI business. (*Id.* ¶¶ 5.c, 89.e.)

## 2.     Defendant's alleged misuse of investor funds

The Affidavit alleged that between 2010 and 2013 Defendant's Cochise Investment bank account received $4 million from AGI's accounts. (*Id.* ¶ 5.d.ii.)  The individual transfers from AGI to Defendant's Cochise account ranged in amounts from $20,000 to $100,000 and were frequently labeled "Loans to Ken." (*Id.* ¶ 71.)  The former AGI Administration Manager, who was responsible for AGI's purchasing and accounting functions, believed that Defendant received over $5 million in transfers from AGI for personal expenses and to pay his bills.  (*Id.* ¶¶ 68, 71.)  These wire transfers for Defendant's "personal living expenses" were in addition to his monthly salary of $30,000.  (*Id.* ¶¶ 70.a, 72.)  With comingled funds received from AGI, Defendant wired from the Cochise account $770,000 to a Canadian company that he owned, $327,000 to a company that fabricates off-road race cars and trucks, and $107,000 to Tesla Motors for a car that was subsequently registered to Defendant's wife.  (*Id.* ¶ 32.a-f.)  He also made payments from the Cochise account to a Canadian Mortgage Corporation[2] and to an American Express Account for his separate business, Apex Racing.  (*Id.* ¶¶ 5.d.i, 32.f.)

The Affidavit stated that Defendant told a confidential human source he belonged to a pilot's club at Scottsdale Airport.  (*Id.* ¶ 33.)  A review of AGI's financial records

---

[2] Defendant owned a residence in Canada. (Doc. 108-3, ¶ 5.d.i.)

revealed that Defendant spent $415,000 of AGI's funds on the pilot's club membership fee. (*Id.*)  Defendant also transferred $750,000 from AGI to a separate business account, and then transferred the $750,000 from that account to a disgruntled investor. (*Id.* ¶ 33.b.1.)  Defendant transferred $500,000 to a company in China that wholesales imported luxury vehicles, (*id.* ¶ 33), and he used AGI funds to make settlement payments toward his civil real estate judgments, (*id.* ¶¶ 5.d.i, 38.b).  Additionally, employees of Apex Racing were on AGI's payroll, even though they spent the majority of their time working on matters unrelated to AGI. (*Id.* ¶¶ 48, 73.)  Overall, Defendant made transfers from AGI to support Apex Racing in the amounts of $170,968, $491,184, and $1,130,110. (*Id.* ¶ 34.)

### 3.    Crimes and locations to be searched

The Affidavit alleged that there was probable cause to believe Defendant committed Conspiracy, 18 U.S.C. § 371; Mail Fraud, 18 U.S.C. § 1341; Wire Fraud, 18 U.S.C. § 1343; and Monetary Transactions with Illegal Proceeds, 18 U.S.C. § 1957. (*Id.* ¶ 6.)  The search warrants authorized searches of AGI's Headquarters; AGI's two testing and engineering facilities; Defendant's personal residence in Phoenix, Arizona; GoDaddy Inc. for information associated with Defendant's internet domain; and Defendant's person. (Doc. 108 at 5.)

### B.    AGI's Expenditures

Turning now to the Motion to Suppress, Defendant alleges that Special Agent Capello omitted from the Affidavit that AGI's exhaustion of funds was due to its proper allocation of $137 million for intellectual property, salary, and real-estate expenses. (Doc. 108 at 8.)  As his offer of proof, Defendant points to two Form 302s that summarize the FBI's interviews of founding member R.O. and AGI's former head engineer and Chief Technology Officer, W.S. (Doc. 109-10 at 2); (Doc. 111-6 at 3.)  One Form 302 indicates that R.O. told Special Agent Capello in September 2015 that "during his employment at AGI over 10 millions [sic] of dollars of investor money was spent on IP alone." (Doc 109-10 at 3.)  The second Form 302 indicates that W.S. told Special

Agent Capello in September 2015 that AGI had a "payroll expense of $700,000 every two weeks and at times the number was higher, nearly $2 million a month at its peak." (Doc. 111-6 at 3.)  W.S. estimated that the "'burn rate' for AGI was nearly $2-3 million a month with a peak of $5 million dollars including salaries and real estate costs."  (*Id*.)  Based on these figures from R.O. and W.S. Defendant proffers that AGI's intellectual property, salary and real estate expenses between 2009 and 2015 would have been over $137 million, which directly contradicts Special Agent Capello's allegation that Defendant intentionally defrauded investors of more than $130 million by misappropriating investor funds.  (*See* Doc. 108-3, ¶ 30); (Doc. 108 at 10.)

The Government responds that Special Agent Capello was not required to include the statements from R.O. and W.S. about AGI's expenditures because R.O. and W.S. also told the FBI that they never had real access to AGI's financial information—Defendant prevented them from viewing it.  (Doc. 119 at 11.)  The Government also contends, by providing recent analyses of AGI's accounts, that W.S.' calculations were unsound because AGI's total salary expenses were actually only approximately $46 million.  (Doc. 119-3 at 2.)  Finally, the Government argues that the Affidavit is not misleading because it describes AGI's general business operations so that the magistrate judges could have reasonably inferred that AGI had legitimate salary and real estate expenses.  (Doc. 119 at 12.)

First, the Court finds that Defendant has not made a substantial preliminary showing that AGI's legitimate salary, real estate, and intellectual property expenses totaled $137 million.  At best, he has shown that one AGI insider *believed* that AGI spent approximately $10 million in intellectual property and that another *believed* AGI's payroll expenses totaled anywhere from $700,000 to $2 million every two weeks, with a monthly "burn rate" of $5 million at AGI's peak.  (Doc. 111-6 at 3.)  Because neither of these insiders had access to AGI's finances, however, their statements to the FBI were conjectural and would not have been material to the finding of probable cause.  Without more, the statements by W.S. and R.O. do not indicate that Defendant directed all AGI's

funds toward appropriate salary, real estate, and intellectual property expenses.  Second, the Court agrees with the Government that the Affidavit described AGI's business operations, real estate costs, and salary expenses in a way that inferred there were legitimate expenses associated with a legitimate business operation.  The Affidavit did not paint a picture that Defendant pocketed every penny AGI raised.  Implicit in the Affidavit is that legitimate expenditures were necessary to maintain investors' confidence in AGI, while Defendant allegedly perpetrated the fraud.  Moreover, the Affidavit stated that Defendant defrauded investors of $130 million while concluding that AGI likely raised between $137 million and $160 million in total.   (Doc. 108-3, ¶¶ 4, 21.b.)  Therefore, even taking W.S. and R.O.'s speculative statements at face value, they would not have been material to the finding of probable cause.

The Court finds that Defendant has not made a substantial preliminary showing that he directed all AGI's funds toward legitimate salary, real estate or intellectual property costs.  Defendant's requests for a *Franks* hearing and suppression of evidence on this basis are **denied**.

### C.    Statement from AGI insider about AGI's Legitimacy

Defendant alleges that Special Agent Capello omitted from the Affidavit that C.H.—who Defendant maintains is an "AGI insider"—allegedly told an Assistant United States Attorney, Kevin Rapp, prior to the execution of the search warrants that AGI was a legitimate enterprise, but that it was "just behind."  (Doc. 108 at 11.)  As his offer of proof, Defendant submits a transcript from a civil deposition, which occurred years after the search warrants were executed, wherein C.H. testified that he "bumped into" AUSA Rapp and told him that AGI was a legitimate enterprise.[3]  (Doc. 113 at 66.)  Defendant also presents an email from C.H. to Defendant, sent in November 2015, assuring Defendant that he told a "buddy" at the United States Attorney's Office that AGI was "legit" and that its "delays were simply due to technical issues not anything sketchy or

---

[3] The Court notes C.H. testified in the civil deposition that he did not know whether the alleged conversation with AUSA Rapp occurred before or after the "FBI raid" but that he "thought" it was before.  (Doc. 113 at 66.)

inappropriate." (Doc. 109-3 at 3.)  The Government again denies that the conversation between C.H. and AUSA Rapp occurred. But it argues that the Affidavit accurately characterized AGI, its employees and its stated purpose. (Doc. 119 at 12-13.)

This is not the first time Defendant has raised this alleged conversation between C.H. and AUSA Rapp. (*See* Docs. 79, 90, 94, 97.)  The Court previously denied Defendant's request for an evidentiary hearing on this allegation under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), which requires the government to disclose evidence that is both favorable to the accused and "material to guilt or punishment." (Doc. 94 at 13.)  The Court found that any alleged statement by C.H. to AUSA Rapp about the viability of AGI's technology would not have been material to Defendant's guilt because C.H. was an AGI investor and business developer who generated investment revenue for AGI.  He was not an engineer or AGI founder who would have been central to developing the launch dates that Defendant communicated to investors to induce investments. (*Id*. at 10, 12-14); (Doc. 109-3 at 2.)  Despite the Court's prior rulings, Defendant now claims that the statement, if included in the Affidavit, would have contradicted the Affidavit's allegations that AGI failed to produce a working prototype, that Defendant artificially portrayed AGI's technology to investors, and that Defendant made promises to investors that were not possible to fulfil. (Doc. 108 at 13.)

Defendant assigns far too much weight to the alleged statement by C.H.  The Court does not agree that the alleged statement by C.H. about AGI being "legitimate [but] just behind" contradicts the assertions in the Affidavit that AGI failed to produce a working prototype, or that Defendant made impossible promises and artificially portrayed AGI's technology to investors. (*Cf.* Doc. 113 at 66.)  The Affidavit did not, as Defendant suggests, paint the picture that AGI was an illegitimate company, void of "real people, real technology, and real engineers." (Doc. 108 at 13.)  In contrast, it explains that the underlying technology behind AGI was authentic and that AGI had office buildings, engineering and testing facilities, employees and an engineering department who would have been likely to achieve product commercialization with $40 million, which

Defendant never allocated.  (Doc. 108-3, ¶¶ 5.e, 9, 26, 46.)  The crux of the Affidavit was not that Defendant created an illegitimate enterprise solely to enrich himself. (*Cf.* Doc. 108 at 13.)  It was that AGI's efforts toward commercialization of the technology were largely thwarted by Defendant's misappropriation of funds, including his misuse of AGI funds for personal expenses.  (*Id.* ¶¶ 4, 26, 30, 85.)

Because the alleged statement by C.H. to AUSA Rapp would have been redundant to statements in the Affidavit from founding members R.O. and R.M. about the legitimacy of AGI's underlying technology and operations, the Court finds that the statement by C.H. (irrespective of whether he is characterized as a victim-investor, an AGI insider, or both) would not have been material to the finding of probable cause. Defendant's requests for a *Franks* hearing and suppression of evidence on this basis are **denied**.

## D.    The FBI's knowledge about the viability of AGI's operations and technology

Defendant claims that Special Agent Capello omitted numerous facts from the Affidavit to hide from the magistrate judge that the FBI knew AGI's technology and operations were legitimate and progressing toward a December 2013 launch, as represented by Defendant to investors.  (Doc. 108 at 13-14); (Doc. 124 at 10); (*cf.* Doc. 108-3 ¶ 18.a.)  The Court addresses each alleged omission below.

### 1.    FBI's August 2013 counterintelligence presentation

Defendant alleges that Special Agent Capello intentionally omitted from the Affidavit that the FBI assigned a liaison to AGI in August 2013 as part of the FBI's counterintelligence program because it determined that AGI's technology was sufficiently viable to be targeted by a foreign nation-state.  (Doc. 108 at 13.)  In his Reply, Defendant ultimately acknowledges that it was AGI who asked the FBI to give the counterintelligence presentation, not the other way around.  (Doc. 124 at 15); (Doc. 119 at 14.)  But he points to AGI's willingness to "invite the FBI into [AGI's] facilities" as evidence that the FBI knew Defendant was not perpetrating investor fraud by artificially portraying AGI's technology.  (Doc. 124 at 15.)

1       The Government responds that the counterintelligence briefing given by Special

2  Agent Lace appears to have been the same presentation that he routinely made to other

3  local corporations that requested it.  (Doc. 119 at 14.)  The Government further states that

4  the counterintelligence briefing occurred one year prior to the FBI opening its

5  investigation in this case, and two years before the FBI executed the search warrants,

6  which the Government maintains is proof that Special Agent Lace's interaction with AGI

7  had no relation to the facts in the search warrant.  (*Id.*)

8       Defendant has not made a substantial preliminary showing that the FBI believed

9  AGI's ZHRO or H2 Energy technologies were sufficiently viable for commercialization.

10 That the FBI gave a non-classified, general counterintelligence presentation to AGI at

11 Defendant's request is insufficient.  Defendant places heavy emphasis on the fact that,

12 according the FBI's website, its counterintelligence outreach is purposed to inform

13 "industry leaders" about potential economic espionage threats.[4] (Doc. 108 at 14.)  But he

14 points to nothing that indicates the FBI limits its general counterintelligence outreach to

15 companies whose technology it has already vetted.   In sum, it was AGI that held itself

16 out as an industry leader with exclusive technology, (Doc. 108-3, ¶ 17), and it was AGI

17 that requested the counterintelligence briefing, (Doc. 124 at 15).  Defendant's offer of

18 proof is therefore insufficient to mandate a *Franks* hearing.

19      The Court further finds that the inferences Defendant draws from the fact that he

20 invited the FBI to AGI's facilities are not convincing. (Doc. 124 at 15.)  Including in the

21 Affidavit that Defendant invited the FBI to give a counterintelligence presentation would

22

23 _____

[4] Special Agent Lace's PowerPoint presentation to AGI contained general information
   that is publicly available on the FBI's website.  (*Compare* Doc. 109-5) (defining
24 counterintelligence, outlining China's five-year plans to acquire technology, explaining
   government espionage, economic espionage, insider threats, cyber threats, foreign travel
25 threats,       and       how       to       minimize       risks),       *with*       FBI,
   https://www.fbi.gov/investigate/counterintelligence (last visited Apr. 30, 2020) (defining
26 counterintelligence    and    economic    espionage),    FBI,    https://www.fbi.gov/file-
   repository/china-exec-summary-risk-to-corporate-america-2019.pdf/view    (last    visited
27 Apr. 30, 2020) (outlining the risk to corporate America posed by China's five-year
   plans), FBI, https://www.fbi.gov/file-repository/insider_threat_brochure.pdf/view (last
28 visited Apr. 30, 2020) (detecting and deterring insider threats), *and* FBI,
   https://www.fbi.gov/file-repository/business-travel-brochure.pdf/view (last visited Apr.
   30, 2020) (safety and security for the business professional traveling abroad).

not make it less likely that he misappropriated investor funds or made hollow promises to investors to induce more investments.  This is particularly so where AGI's inflow of investment revenue hinged on investors' perceived reputation of AGI, which Defendant clearly believed would be bolstered by the fact that the FBI gave the counterintelligence presentation.  (*See* Doc. 108 at 14.)

Defendant has not made a substantial preliminary showing of an intentional or reckless material omission related to the FBI's counterintelligence presentation at AGI in 2013.  Accordingly, the Court will **deny** a *Franks* hearing and suppression on that basis.

### 2.      Special Agent Lace and the hydrogen technology

Defendant alleges that Special Agent Capello omitted from the Affidavit that Special Agent Lace viewed a working prototype of the ZHRO technology during his counterintelligence presentation in August 2013.  (Doc. 108 at 14-15); (Doc. 124 at 15.) As his offers of proof, Defendant points to the Government's assertions in prior briefing that Special Agent Lace went through most of the rooms at AGI and viewed an "engine cut-away with respect to the hydrogen technology" after his counterintelligence presentation in August 2013.  (Doc. 108 at 14-15) (*citing* Doc. 72-4 at 3.)  Defendant also submits an email sent from W.S. (AGI's former head engineer and CTO) to AGI insiders in July 2013 with a video attachment of the "CAT C15 engine running on AGI 6E injectors," (Doc. 109-6 at 2), and an email sent in August 2013 from W.S. to Defendant, J.M. (AGI's Chief Operating Officer), and founding member R.O., confirming the success of the "demo trailer," (Doc. 109-7 at 2).[5] Defendant surmises from these three things that there was a working prototype of the conversion kits in August 2013 and that Special Agent Lace must have observed it.  (Doc. 108 at 15.)

Defendant's offer of proof is insufficient to warrant a *Franks* hearing.  If AGI had

---

[5] Defendant furtively states in the Reply that the Affidavit should have included information that "W.S. reported AGI's technology was 'near to our targets' for a December 2013 launch."  (Doc. 124 at 16.)  Defendant makes this statement without citation or clarification.  To the extent Defendant is referencing the statement that W.S. made *to AGI insiders* in an email (*see* Doc. 109-6), Defendant has never alleged that the FBI was in possession of that email when Special Agent Capello drafted the Affidavit. Defendant's attempt to construe statements in W.S.'s email as information that W.S. reported to the FBI is not convincing.

produced a working prototype, prior to December 2015, of conversion kits that could convert diesel truck engines to run on compressed natural gas—technology that AGI maintained was exclusive to AGI, (Doc. 108-3, ¶ 17.a)—there would be more proof than the two internal AGI emails sent by W.S. in July and August 2013 about "6E injectors" and "the demo trailer."  In fact, even the emails from W.S. indicate that "all of the data [was] showing that [they would] very likely not meet the 6/15 goal of full power, and [that they were] now using resources for the 6E that could be utilized preparing for 8A and that major push."  (Doc. 109-7 at 2.)  The emails further state that getting the CAT C15 engine to run on AGI 6E injectors was a "mini milestone" and that further development would be needed "to achieve full power, fuel efficiency, and emissions targets."  (Doc. 109-6 at 2.)  In other words, while the emails from W.S. to AGI insiders in July and August 2013 may have indicated that AGI was making progress toward commercialization of the conversion kits, the emails also indicate that there were numerous remaining steps toward achieving that goal.

Because the Court does not agree that the emails are sufficient to suggest the existence of a working prototype, the Court is left to consider what it meant that Special Agent Lace was shown an "engine cut-away with respect to the hydrogen technology" after he gave his counterintelligence briefing at AGI.  (Doc. 72-4 at 3.)  Certainly, if the "engine cut-away with respect to the hydrogen technology" was a working prototype of the ZHRO or H2 Energy technologies, it would rebut the allegation in the Affidavit that AGI failed to produce a working prototype.  (*Cf.* Doc. 108-3, ¶ 18.a.)  But the sole evidence proffered by Defendant for why the "engine cut-away with respect to the hydrogen technology" was a prototype, are the same emails from W.S.  (Doc. 108 at 15) ("Special Agent Lace would have observed the technology referenced in W.S.'s emails during his tour of AGI in late August 2013.")  For the reasons stated above, the Court finds that W.S.'s emails are insufficient to make a threshold showing that AGI developed a working prototype of the conversion kits prior to December 2015.  Without more, the fact that Special Agent Lace viewed an "engine cut-away with respect to the hydrogen

technology" does not mandate a *Franks* hearing.

Because Defendant has not made a substantial preliminary showing that Special Agent Lace viewed a working prototype of the ZHRO or H2 Technologies that were promised for commercialization by Defendant, Defendant's requests for a *Franks* hearing and suppression on that basis are **denied**.

### 3.   W.S.'s "no tricks" statement

Defendant claims that Special Agent Capello intentionally omitted from the Affidavit that W.S. told the FBI in October 2015 that no tricks were used during the demonstrations for would-be investors. (Doc. 108 at 15.)   As his offer of proof, Defendant submits a Form 302 summarizing the FBI's interview of W.S., wherein "W.S. stated the demos were real and no tricks were used."  (Doc. 109-8 at 2.)  Defendant is improperly isolating one sentence in this Form 302 and taking it out of context.  In the same Form 302, the FBI reports that "W.S. stated [Defendant] guided the tours at the demos, and would tell potential investors that the demo they were viewing was currently running at 100% load, had been running for over 100 hours, and was hitting all its marks. W.S. revealed in actuality, the demo had only been running a few minutes, was under 10% load, and was not meeting the marks being told to potential investors.  W.S. revealed [Defendant] was extremely exaggerating the statements regarding the performance of the demos he was making to potential investors."  (*Id.*)  The Form 302 itself, therefore, makes it clear that W.S. told the FBI Defendant manipulated investors' perceptions of the demonstrations.

Leaving no doubt about the meaning of W.S.'s "no tricks" statement, however, is the transcript of W.S.'s interview, which was provided by the Government.  W.S. told the FBI that the demonstrations were "real demonstrations . . . [they] weren't tricking anyone . . . those were all typically very staged events, um, where *we weren't faking anything in terms of running the engine* . . . but we were running the engine just to show it . . . and partly because the injectors would fail so quickly we couldn't afford to sit there and let it run for eight hours . . . we'd have to preserve the ten minutes that it might

last . . . to make it run on command for that show and tell without it failing in the middle of the test."  (Doc. 119-14 at 17-18, 19-20) (emphasis added.)  W.S.'s statement to the FBI that AGI was not tricking anybody in terms of running the engine is consistent with the Affidavit's allegation that Defendant staged demonstrations and told investors that the engines could run for 100 hours, when they could only run for 10 minutes. (Doc. 108-3, ¶ 20.b.)  Defendant has not made a substantial showing of the alleged omission. The requests for a *Franks* hearing and suppression on this ground are **denied**.

### 4.    R.M.'s "ready for market" statement

Defendant alleges that Special Agent Capello omitted from the Affidavit that founding member R.M. told the FBI in September 2015 that he had a product ready for market in 2007-2008.  (Doc. 108 at 14-15.)  According to Defendant, this statement would have undermined the Affidavit's allegation that AGI failed to produce a working prototype.  (*Id.* at 15.)  As his offer of proof, Defendant submits a Form 302 summarizing the FBI's interview of R.M.  (Doc. 109-9 at 3.)  The Government responds that, while the Affidavit does not contain the statement by R.M., the Affidavit indicates that "company sources" believed a product could have been ready for market in 2010, absent Defendant's interference with funding and operations.  (Doc. 119 at 15) (*citing* Doc. 108-3, ¶ 26.)  The Court finds that R.M.'s statement about having a product ready for market in 2007-2008 would not have added anything beyond the statement in the Affidavit that "company sources" (which may have included R.M.) said the product would have been ready for market as early as 2010, but for Defendant's interference.  The Court finds that the salient point of both statements is that Defendant thwarted commercialization efforts.  Defendant's requests for a *Franks* hearing and suppression on this ground are **denied**.

### E.    Founding members' civil litigation against Defendant

Defendant claims that Special Agent Capello intentionally omitted from the Affidavit that AGI's founding members, R.M. and R.O., were pursuing civil litigation against Defendant for his alleged theft of intellectual property.  (Doc. 108 at 16-19.)  Defendant argues that by omitting this information from the Affidavit, Special Agent

Capello did not allow the magistrate judge to test the veracity of the information R.M. and R.O. supplied to the FBI.  (*Id*. at 18.)   Defendant points to Form 302s documenting the FBI's knowledge that R.M. and R.O. believed Defendant had stolen the intellectual property rights of patents that were developed by R.M., and that they were considering "a potential civil suit" against Defendant.  (Doc. 110-2 at 2.)   The Government responds that R.M. and R.O. did not initiate the civil litigation against Defendant until March 2016, after the Affidavit was presented.  (Doc. 119 at 15.)  In any event, the Government states that there was ample information in the affidavit from which the magistrate judge could have assessed the founding members' motivations and possible biases.  (*Id*. at 15-16.)

The Court agrees with the Government that the "potential civil suit" is neither surprising nor material.  Defendant has not made a preliminary substantial showing to warrant a *Franks* hearing on this issue.   To the extent that Defendant argues the potential intellectual property suit is evidence of AGI's legitimacy, the Court reiterates its finding above that the Affidavit did not characterize AGI as an illegitimate company, but made specific references to the technology, patents, and licensing agreements.  (Doc. 108-3, ¶¶ 11.b, 12.a.)   The requests for a *Franks* hearing and suppression on this basis are **denied**.

F.   **Defendant's contributions to AGI**

Defendant alleges that Special Agent Capello intentionally misrepresented and omitted multiple facts about Defendant's personal monetary contributions to AGI to create the false impression that Defendant "bilked AGI for personal gain while providing little in return."  (Doc. 108 at 19-20.)   None of Defendant's contentions warrant a *Franks* hearing.

1.   **AGI's operating agreement**

Defendant alleges that Special Agent Capello omitted that AGI's operating agreement did not require any capital contribution from Defendant.  (Doc. 108 at 19.) The Government responds that the Affidavit did not suggest that the capital contribution

requirement was founded in an operating agreement, but instead outlined numerous statements made or ratified by Defendant about his promised or actual contributions. (Doc. 119 at 17.)  The Court agrees with the Government.  The Affidavit states only that, according to R.O. and R.M., Defendant *promised* or *agreed* he would contribute $10 million in seed money to AGI in exchange for a controlling ownership equity stake in AGI.  (Doc. 108-3, ¶¶ 38.a, 40.)  Because the Affidavit points to further instances where Defendant told other people that he contributed "millions" or "his life savings" to AGI, the Court finds that the omission regarding the absence of a contractual provision in the operating agreement is not material.  (*Id.* ¶¶ 88.e.v, 89.b.)  Defendant's requests for a *Franks* hearing and suppression on this basis are **denied**.

### 2.    Alleged $4 million contribution

Defendant claims that Special Agent Capello omitted that Defendant contributed $4 million to AGI.  (Doc. 108 at 20.)  As his offer of proof Defendant submits general ledgers from Apex Racing and his Cochise Investments account, portions of which were obtained by the FBI during the execution of the search warrants.  (Doc. 110-5); Doc. 110-6); (Doc. 119 at 17 n.7.)  The Government responds that the ledgers are unaudited and are of unknown authenticity, (Doc. 119 at 17 n.7), but that a recent analysis of all relevant bank accounts indicates that Defendant transferred $11.3 million from AGI to Defendant and that he only transferred $3.3 million back to AGI.  (Doc. 119 at 17.)  The Government further states that the ledgers submitted by Defendant indicate that he transferred approximately $2.5 million to AGI, but that only $500,000 of those transfers were marked as "funding" to AGI, while the rest were labeled "loan repayment." (*Id.*)

The Court is not persuaded by the ledgers for three reasons.  They are unauthenticated.  They appear to be records made by or at the direction of Defendant. And the FBI did not base its calculations in the Affidavit on the ledgers—its calculations were based on an initial review of the relevant bank accounts.  Because Defendant's offer of proof does not contain bank records of the accounts referenced in the Affidavit, the Court finds that he has not made a threshold showing to warrant a hearing.  The requests

for a *Franks* hearing and suppression on this basis are **denied**.

### 3. Reduction of Defendant's required investment

Defendant asserts that Special Agent Capello intentionally omitted that R.O. and R.M. agreed to reduce Defendant's initial capital contribution to $3 million instead of $10 million. (Doc. 108 at 19-20.) He points to a Form 302 documenting a statement by R.O. that he and R.M. agreed to reduce Defendant's initial investment to $3 million because Defendant's real estate investments "tumbled" after they had formed AGI. (Doc. 109-10 at 3.) The Form 302 notes, however, that R.O. did not believe Defendant had even contributed the $3 million. (*Id.*) In response, the Government submitted a transcript of R.O.'s interview, which clarifies that R.O. said "the promise of investment [from Defendant] began with ten million . . . [a]nd then after the crash got adjusted to three million immediate. And then the balance over time." (Doc. 119-13 at 8-9.)

The Court finds that the Affidavit accurately stated that Defendant promised R.O. and R.M. that he would contribute $10 million total to AGI. With no proof that Defendant contributed the adjusted initial amount of $3 million, there is no indication that Defendant fulfilled any of his promises to R.O. and R.M. surrounding his contributions to AGI. Therefore, the Affidavit's omission of the "over time" adjustment to the agreement is not material. Defendant's requests for a *Franks* hearing and suppression on this ground are **denied**.

### G. AGI's organizational documents

Defendant contends that Special Agent Capello intentionally omitted that AGI's organizational documents did not restrict company funds to any particular use. (Doc. 108 at 20.) Without a restriction on his use of investor funds, Defendant states that none of the expenditures outlined in the Affidavit are truly misappropriations. (*Id.*) He further provides evidence to rebut the Affidavit's allegations about the Apex Racing and pilot's club misappropriations.

### 1.    Restrictions on use of company funds

Defendant submitted AGI's operating agreement, which does not restrict how company funds must be appropriated.  (Doc. 110-4.)  The Government responds that the Affidavit does not state or imply that Defendant's misappropriations were in violation of the operating agreement.  (Doc. 119 at 19.)  The Court agrees with the Government.  The Affidavit clearly indicates that Defendant had sole control of AGI funds and directed how they were spent, without implying that his spending was somehow limited by an operational agreement.   Moreover, that the operating agreement did not restrict Defendant's use of investor funds is immaterial because the Affidavit alleged that Defendant promised investors their money would not be spent on matters unrelated to AGI.   (Doc. 108-3, ¶¶ 5.c, 89.e.)   Defendant's requests for a *Franks* hearing and suppression on this issue are **denied**.

### 2.    Apex Racing

Defendant claims that Special Agent Capello mischaracterized the Apex Racing expenditures as misappropriations.  (Doc. 108 at 22.)  He points to statements made by R.M. and R.O. to the FBI that they had agreed Defendant could spend AGI funds on Apex Racing as a means of networking with potential investors and marketing AGI and the ZHRO technologies.  (Doc. 109-10 at 4.)  While there was no written agreement about the amount Defendant could spend on Apex, R.O. indicated that he and R.M. knew Defendant was spending AGI funds on his Apex Racing business.  (*Id.*)  To that effect, in the transcript of R.O.'s interview, R.O. indicated that he and R.M. had a "gentleman's agreement" about Apex Racing and that they would have considered it reasonable if Defendant spent $2 million of AGI's funds on Apex.   (Doc. 119-13 at 14.) R.O. indicated, however, that they had no way to track Defendant's spending on Apex because he rebuffed their requests to see budgets.  (*Id.*)

The Affidavit improperly paints a picture that Defendant was deceitfully diverting AGI funds to his Apex Racing business for reasons unrelated to AGI.  That R.O. and R.M. knew and agreed to support Apex Racing with AGI funds for the purpose of

marketing AGI and networking—and that they would have approved $2 million for that purpose—are clear omissions.   Although these omissions rendered the Affidavit's statements about Apex Racing misleading, the Court finds that the omissions were not material.   The "gentleman's agreement" about supporting Apex Racing was not material to the finding of probable cause because there are numerous additional examples in the Affidavit of Defendant misusing investor funds for his personal expenses, including making transfers to his other businesses, to a Canadian mortgage company, to Tesla, and to pay his personal civil judgments.   Defendant's requests for *Franks* hearing and suppression on this basis are therefore **denied**.

### 3.      Pilot's club

Defendant asserts that Special Agent Capello mischaracterized Defendant's purchase of the pilot's club membership as a misappropriation because it was purchased so that AGI personnel could use the plane for AGI business purposes.   (Doc. 108 at 22.) He submits a declaration from the former Senior Vice President of AGI, stating that AGT Venture Holdings purchased a fractional interest in the airplanes for business purposes related to AGI and that R.O. and R.M. also used the airplanes to travel for business meetings.   (Doc. 110-9 at 2.)   Defendant additionally presents the operating agreement for the pilot's club.   (Doc. 111-1 at 23.)   The Government responds that the Affidavit accurately described Defendant's statement to a confidential human source about the pilot's club, but that in any event, the operating agreement for the pilot's club and the Senior Vice President's affidavit were given to the Government in discovery and were not known to the FBI when the Affidavit was drafted.   (Doc. 119 at 20.)

The Court agrees with the Government that that Defendant has not made a substantial preliminary showing of an intentional or reckless omission.   According to the transcript of the conversation between Defendant and the confidential source, (Doc. 119-10 at 4-8), Defendant's comment about belonging to the pilot's club was made during a conversation about his *personal* flying endeavors and the planes he had *personally* owned.   In fact, when Defendant told the source that he had recently paid $275,000 to

join the pilot's club, Defendant made no mention of AGI or that he had purchased the membership for business-related purposes.   (*Id.* at 8-9.)   The Court finds that the Affidavit accurately relayed information that Defendant told the confidential human source.   (Doc. 108-3, ¶ 33.a.i-ii.)   Defendant's requests for a *Franks* hearing and suppression on this basis are **denied**.

### 4.      J.M.'s approval of the wire transfers

Defendant claims Special Agent Capello omitted that the alleged misappropriations were approved by AGI executives.   (Doc. 108 at 23.)   He acknowledges, however, that the Affidavit indicates personal transfers from AGI to Defendant were approved by J.M., AGI's Chief Operating Officer.   (*Id.*) (*citing* Doc. 108-3, ¶ 71.)   The fact that J.M. (to whom Defendant apparently gave $90,000 of AGI's funds to help purchase a new house) approved the personal transfers to Defendant does not mean that Defendant's alleged misappropriates were "approved by other AGI executives." (Doc. 108 at 23); (Doc. 108-3, ¶¶ 66, 76.)   In fact, according to AGI's former Administration Manager, J.M. was the *only* one who approved the transfers to Defendant—the Vice President of Finance repeatedly declined to do so. (Doc. 108-3, ¶ 71.)   Defendant has not demonstrated that there was an omission or misrepresentation regarding AGI executives' approval of the wire transfers to Defendant's personal accounts, and the requests for a *Franks* hearing and suppression on that basis are **denied**.

### H.      Alleged misrepresentations by Special Agent Capello

Defendant alleges that Special Agent Capello made many misrepresentations, some of which Defendant additionally cast as omissions that the Court has already addressed.   As for the remaining alleged misrepresentations, the Court finds that a *Franks* hearing is not warranted.

### 1.      Civil judgments

Defendant alleges Special Agent Capello misrepresented that Defendant used investor funds to make payments toward his personal civil judgments. (Doc. 108 at 23.) Defendant claims that R.O. was the source of this information, and that R.O. only

"thought" that Defendant was paying off his civil judgments but "had no proof." (Doc. 109-10 at 4.) According to the Affidavit, however, R.M. stated that Defendant diverted AGI's investment monies to his personal interests, including paying off legal civil settlements from prior real estate matters. (Doc. 108-3, ¶ 38.b.) W.S. stated the same. (*Id*. ¶ 62.) Defendant's citation to statements by R.O., therefore, are insufficient. Defendant has not made a substantial preliminary showing of a material misrepresentation.

### 2. Insolvency

Because AGI did not ultimately file bankruptcy until 2019, Defendant takes issue with the Affidavit's statement that AGI was on the verge of insolvency. (Doc. 108 at 24); (Doc. 108-3, ¶ 5.g.) Defendant does not meaningfully dispute, however, the allegations that, at the time the Affidavit was submitted AGI had laid off 40% of its work force, ceased operations in several business segments, had $10 million in unpaid vendor bills, stopped paying vendors altogether, and possessed insufficient funds in its accounts to sustain its monthly burn rate. (*Id*. ¶¶ 5.g.i, 53, 85.) The Court finds that there was no material misrepresentation.

### 3. Distribution agreement holders

Defendant objects to the Affidavit's use of the term "investor" to describe parties who purchased the exclusive rights to market AGI's products via distribution agreements. (Doc. 108 at 24.) Because he acknowledges that AGI principally raised funds through these distribution agreements and that the Affidavit accurately reports as much, the term used to describe distribution agreement holders does not materially affect the allegations in the Affidavit.

### 4. Tax distributions

Defendant objects to the statement that $3.5 million was transferred from AGI to Defendant's Cochise Investments account because he claims that he received that money as a yearly tax distribution pursuant to AGI's operating agreement. (Doc. 108 at 24.) Defendant does not allege or set forth any proof that Special Agent Capello knew or had

reason to know that the $3.5 million was allegedly for "the tax obligations on AGI's income [that] passed through to [Defendant]."  (Doc. 124 at 21.)  Because Defendant agrees that $3.5 million was transferred from AGI to his Cochise account, the Court finds that there was no material misrepresentation.

### 5.     Ponzi-type payments

Defendant challenges Special Agent Capello's use of the word "Ponzi" to describe the payments Defendant made to disgruntled investors with AGI funds.  (Doc. 108 at 24); (Doc. 108-3, ¶ 33.b.)  He claims that because he told an undercover employee and a confidential human source about one of the alleged Ponzi-type payments, the payment could not have actually been a Ponzi payment.  (Doc. 108 at 24); (Doc. 108-3, ¶ 33.b.iv.)  The Affidavit, however, recounts numerous instances of Ponzi-type payments apart from the one Defendant described to the undercover employee and the confidential human source.  (*See id.* ¶¶ 33.b.ii.1, 59) (Defendant transferred $750,000 of AGI's funds to a company owned by a disgruntled investor; W.S. confirmed that investors from one sector were paid off with investor money from other sectors; and W.S. said he heard an investor accuse Defendant of running a Ponzi scheme.)  The Court finds that the "Ponzi" description was not a material misrepresentation.

### 6.     Bright Praise Enterprises

Defendant claims Special Agent Capello misrepresented that Defendant wired $500,000 to Bright Praise Enterprises, a Chinese company that wholesales imported luxury vehicles.  (Doc. 108 at 24); (Doc. 108-3, ¶ 33.c.)  Defendant states that he actually wired the $500,000 to Praise Enterprises, a Canadian company, for the purpose of buying a partner out of a distribution agreement.  (Doc. 108 at 24.)  The Court does not see how this helps Defendant.  Including in the affidavit that Defendant wired $500,000 of AGI funds to a disgruntled investor (as opposed to purchasing imported luxury vehicles) would not have affected the finding of probable cause.

### 7.    English hedge fund

Defendant challenges the Affidavit's description of the interaction between Defendant and an English hedge fund.  (Doc. 108 at 25.)   The Affidavit alleged that members of an English hedge fund visited AGI to discuss the potential of investing $155 million in AGI's flare gas sector.   (Doc. 108-3, ¶ 49.)   Upon witnessing the demonstrations, however, the hedge fund was not impressed and decided not to invest.  (*Id*.)  According to the Affidavit, Defendant told investors that it was AGI that passed on the $155 million investment, not the other way around.  (*Id*.)

Defendant curiously claims in the Motion that Special Agent Capello misrepresented the hedge fund's interaction with AGI because Defendant accurately told AGI investors that the hedge fund was not going to invest in AGI.   Defendant misses the point.  Covering up a significant would-be investor's disinterest to instill false confidence in other investors is still a falsification.  Defendant has not shown that Special Agent Capello misrepresented Defendant's statements regarding the hedge fund.

### 8.    Idea to start AGI

Defendant disagrees with the Affidavit's assertion that he lied when he told a confidential source, who was posing as a would-be investor, that it was Defendant's thinking that started AGI.  (Doc. 108 at 25.)  He points to evidence that R.M. told the FBI it was Defendant who had the idea to bring R.M.'s ideas to market. (Doc. 109-9 at 3); (Doc. 108-3, ¶ 88.e.)  The Government presents an interview of founding member R.O., however, wherein R.O. stated that he approached Defendant at a conference and pitched the idea of AGI to Defendant.  (Doc. 119-13 at 4.)   At best, Defendant's claim to the confidential source was only half true because the underlying idea for the technology behind AGI was R.M.'s.  In any event, the allegation that Defendant falsely indicated it was his idea to start AGI (Doc. 108-3, ¶ 88.e.4) was not material to the finding of probable cause.

### 9.     Access to AGI's finances

Defendant disputes the Affidavit's allegation that a confidential source was "falsely informed that 'we've always allowed anyone the ability to look at the books over the past four years.'"  (Doc. 108-3, ¶ 88.e.vi.)   As his offer of proof Defendant references a Form 302 that indicates AGI's Vice President of Finance emailed an undercover employee AGI's financial statements. (Doc. 108 at 24); (Doc. 108-3, ¶ 71.)   It is not surprising that the Vice President of Finance had access to AGI's financial records, and such access does not refute the remaining allegations from multiple AGI insiders that Defendant prevented them from viewing AGI's financial records.

### I.     Alleged conclusory statements by Special Agent Capello

A search warrant may not rest upon mere affirmance or belief without disclosing the supporting facts or circumstances.  *Gates*, 462 U.S. at 239; *Nathanson v. United States*, 290 U.S. 41, 47 (1933).  Defendant urges the Court to ignore numerous statements in the Affidavit that he claims are conclusory or not attributed to him.  (Doc. 108 at 25-27); (Doc. 108-2 at 2-3.)   Many of the statements he references as conclusory, however, provide relevant background information or are further elaborated upon throughout the Affidavit.   (*Compare* Doc. 108-3, ¶ 20.c) (W.S. knew Defendant was making "exaggerated and misleading claims to investors"), *with* (*id*. ¶¶ 60, 64) (Defendant used pro forma financial statements to promise investors outlandish returns on their investments); *compare* (*id*. ¶ 43) (stating that Defendant had a hidden agenda that was not shared with R.M. or R.O.), *with* (*id*.) (explaining thereafter that the common thread was Defendant's unwillingness to publish budget and pay bills.)  The Affidavit is far from conclusory.  Defendant's request for the Court to ignore certain statements is denied.

### III.   CONCLUSION

Defendant has not made the required substantial preliminary showing to mandate a *Franks* hearing.  Accordingly,

1      **IT IS ORDERED** denying Defendant's Motion to Suppress Pursuant to *Franks v.*

2    *Delaware*, 438 U.S. 154 (1978) (Doc. 108).

3      Dated this 30th day of April, 2020.

Michael T. Liburdi
United States District Judge